[No. 332.    Decided June 3, 1892.]

HENRY L. YESLER AND JOHN D. LOWMAN, *Administrator of the Estate of Sarah B. Yesler, Deceased, Appellants,* v. LUCINDA D. HOCHSTETTLER, *Respondent.*

APPEAL—FINDINGS IN EQUITY CASES—COMMUNITY PROPERTY—PRESUMPTIONS—APPEALS FROM PROBATE COURTS.

Under the law requiring a trial *de novo* in appeals in equity cases, the supreme court is not bound by the findings of fact as made by the superior court.

Under the statutes of this state lands acquired after marriage by a deed of purchase expressing a money consideration are presumed to be community property, and the presumption can be rebutted only by clear and convincing proof that the lands were acquired by gift, or that the consideration was furnished out of the grantee's separate property.

The fact that a husband permitted his wife to use the money arising from the rents and profits of his separate real estate for the purchase of lands in her own name affords no presumption of a gift to her of such money.

Where a wife has obtained money by inheritance, from the rents and profits of her husband's separate property, and from keeping boarders, all which sums she has disposed of indiscriminately in the purchase of land, and in personal expenses and gifts, the confusion of the separate and community funds will work a forfeiture of the separate character of the property thus purchased.

The filing of an inventory, under the act of 1873, by the wife in the office of the county auditor setting forth that certain property is her separate property cannot be treated as an admission of that fact on the part of the husband.

The execution by the husband and wife of a power of attorney reciting that certain real estate is the property of the wife is a binding admission of such fact by the husband, in the absence of any evidence to the contrary, despite the subsequent revocation of the power of attorney.

Lands purchased by a wife with the proceeds of a loan secured by mortgage on her separate property become the common property of husband and wife.

The fact that but one of several heirs appealed from the order of distribution entered in the probate court did not confine the supe-

rior court ·to an adjudication merely upon the interest of the heir appealing, but the whole cause was removed to the superior court, under ch. 114, Code 1881, for trial *de novo*.

*Appeal from Superior Court, King County.*

The facts are stated in the opinion.

*J. R. Lewis, Preston, Carr & Preston,* and *L. C. Gilman,* for appellants.

*Greene & Turner,* for respondent.

The opinion of the court was delivered by

STILES, J.—This appeal is from a decree of the superior court of King county reversing a decree of the former probate court of that county, in the matter of the distribution of the estate of Sarah B. Yesler, deceased, late wife of the appellant, Henry L. Yesler. The decedent left her surviving nine brothers and sisters, of whom respondent was one, but no children. The probate court found all the property here in controversy to have been the common property of the husband and wife, and distributed it to the husband. The superior court reversed the finding, and held all the property to have been the separate property of the wife, and distributed one-half of it to the husband, and the other half to the brothers and sisters. Respondent here was the sole appellant from the decree of the probate court.

The Yeslers intermarried in the State of Ohio, in 1839. In 1852 the husband removed to Washington Territory, where he filed donation claim No. 47. In 1876 the claim was patented—the west half to the husband, and the east half to the wife. In 1858 Mrs. Yesler joined her husband and they continued their residence in the city of Seattle, until her death in August, 1887. Upon her arrival in Washington Mrs. Yesler had no separate property except her half of the donation claim, but in 1866–67 she re-

ceived about $1,000 by descent from the estates of deceased relatives, and in the succeeding nine years about as much more from the same sources.    Mr. Yesler improved his land by erecting buildings thereon, which were rented, and by the planting of orchards from which fruits were sold.    The statement of facts shows that from 1874 to 1877 various sums of money derived from the rents of her husband's buildings were had and used by Mrs. Yesler, with her husband's permission, in all $7,385. And between 1873 and 1884 she had and used from the sales of fruit grown in his orchards $2,712.    In 1871–74 she received from a boarder $992.    It is agreed that Mr. Yesler at all times furnished all the provisions, fuel, light and whatever was necessary for the house, and paid the wages of cooks, gardeners and servants.    In 1866, shortly after receiving her first inheritance, Mrs. Yesler expended sums equal to the greater part of it in a visit to San Francisco, and the purchase of house furniture.    She did not dispose of her part of the donation claim.    At her death she left a large estate, mostly in real property, all of which, with the exception of the donation claim and what is known as the "Wilson Farm," is involved in this litigation.

In opening her case the respondent protests against the court's going behind the finding of the superior court that all of the property in controversy was the separate property of Mrs. Yesler, unless the case shows a decided preponderance of evidence against the finding.    It would relieve this court of a considerable burden of labor and responsibility if the rule contended for were applicable to such cases.    It is the rule in actions at law tried by the court without a jury; but in equity cases, so long as the system of trial *de novo* in this court continues, a reinvestigation is peremptory.    Not but that, where the testimony is conflicting, and especially where witnesses appeared in the lower court, we should give due weight to the opinion

of the trial judge who saw and listened to the witnesses as his opinion is expressed in the judgment; because in such cases he has the clear advantage of us in judging the credibility of the statements made. But in a case like the one before us, where every fact is contained in stipulations which include numerous deeds and other instruments, without any attempt at explanation or modification, we are placed by the record in precisely the same position, in every respect, as the trial judge, and can have no excuse for leaning upon his views of the evidence. The practice in California in equity cases is pressed upon our attention upon this point. In *Donahoe v. Mariposa, etc., Co.*, 66 Cal., 317, the supreme court of that state said, concerning a finding that there had been no extension of time for payment of certain notes: "It is the settled rule here that, in equity as in other causes, findings of fact are not to be disturbed where the evidence is substantially conflicting." But in that state all actions, whether at law or in equity, tried by the court without a jury, are treated alike by the filing of findings upon every material issue of both law and fact; and upon appeal the same rules apply to each class of cases, there being no such thing as a trial *de novo* in the supreme court, if we are advised correctly from the cases reported. Therefore, while reference to the practice in California and many other of the code states where the like systems have been adopted, might be of great value and benefit if made to the legislature, it can effect nothing except by way of inducing regret when made to this court. But we do not regard this finding as one of fact, but rather one of law, if it was intended as a finding at all. It was: "At the time of her death the decedent, subject to such equities as might then exist in third persons, was seized in fee simple as her sole and separate property of the following lands and premises," which was the affirmative proposition made by the

respondent against the negative raised by the appellants, that it was the common property of the decedent and her husband.  These two propositions made the issue to be tried.  But the "facts" were a very different matter; as, for example, all of the lands were conveyed to Mrs. Yesler by deeds of purchase, a material fact not possible to be avoided in any proper findings which might have been made.

It is conceded that the several sources of revenue above mentioned were the foundation upon which this estate was built, with the exception that in 1882–83 Mrs. Yesler purchased certain lands with money borrowed of third parties, for the repayment of which she mortgaged her donation claim, but which loan was repaid out of sales of the lands purchased without recourse to the mortgage. Her gross receipts in their original form were about $20,000, of which she laid out about half in the purchase of land.

The acts of 1873 and 1881 governing the property rights of married persons are involved in the case, as portions of the property were acquired under each of those statutes.

Concerning all the parcels, it is agreed that they were acquired by ordinary deeds expressing a valuable consideration; and appellants' claim is, that that fact establishes the first advantage for them, inasmuch as the accepted rule of construction in those states where there are statutes similar to ours is that lands conveyed by deed of purchase to either husband or wife during the continuance of the marriage relation are *prima facie* common property. *Meyer v. Kinzer*, 12 Cal. 248 (73 Am. Dec. 538); *Pixley v. Huggins*, 15 Cal. 128; *Tolman v. Smith*, 85 Cal. 280; *Pearson v. Ricker*, 15 La. Ann. 119; *Gogreve v. Dehon*, 41 La. Ann. 244; *Love v. Robertson*, 7 Tex. 6 (56 Am. Dec. 41); *Pearce v. Jackson*, 61 Tex. 642; *Kimberlin v. Westerman*, 75 Tex. 127.  It has also been so held in this state, by strong in-

23—4 WASH.

ference. *Lemon v. Waterman,* 2 Wash. T. 485; *Gratton v. Webber,* 47 Fed. Rep. 852.

The respondent concedes that this presumption exists in this state, and has existed under all the acts mentioned. But the authorities also lay down the rule that the presumption can be overcome only by clear and convincing proof, which respondent does not admit as the proper rule, but asserts to the contrary that under our statutes the presumption is destroyed when it is opposed by any evidence whatever to the contrary. Concerning this point, we cannot adopt the proposition of the respondent. The logic of the correct rule is simple enough. Under the statutes, property acquired after the marriage is common or community property, unless it is acquired by gift, bequest, devise or descent. A deed of real estate expressing a money consideration shows the acquisition not to be within the exceptions. We say "exceptions" because, during the marriage relation, the community of the spouses is, and, in the nature of things, must be, the superior and controlling entity; its interests are paramount, and whatever tends to reduce its position must be exceptional. Therefore, in any controversey, the deed standing alone and uncontradicted by any evidence, affords what amounts to a conclusive presumption that its subject matter is common property. But the assertion of an exception merely requires the production of proof either that the conveyance was in fact a lawful gift, or that the consideration was furnished by husband or wife individually out of funds or property which he or she was entitled, under the law, to hold as separate property. Whatever satisfies the court or jury of the truth of one or the other of these probative facts, will authorize the finding of the ultimate fact that the subject of the conveyance was separate and not common property, and thus the presumption will be overcome. But if the evidence of the opposite parties leaves the matter in doubt

the presumption continues to weigh for the community, and will decide the question. *Smith v. Smith,* 12 Cal. 226, and cases; *Lewis v. Johns,* 24 Cal. 98 (85 Am. Dec. 49).

The lands in dispute bear a well-defined distinction in this, that those of the first class were all acquired under the act of 1873, while those of the second class were all acquired under the act of 1881. The first purchase of the former class was made September 3, 1875, and the last July 30, 1878; the first purchase of the second class was made January 6, 1882, and the last April 1, 1883. In this separation of the two classes, we lay out of the consideration the statement that certain of the lands of the second class were contracted for in 1880–81, as no contracts appear; the only fact tending to sustain the allegation of prior contracts being the dates of the deeds, while the stipulation is that the deeds were delivered and the price paid in 1882.

The lands in the first class were purchased at a total cost of $755. Prior to the first purchase, Mrs. Yesler, according to the account proposed by the respondent, had in her possession $7,768.25, of which $1,345.13 was hers by inheritance, and the remainder was derived from rents and profits of her husband's separate property, board money and interest on loans. Including the $175 she paid for her first purchase, she had on hand September 3, 1875, $3,-263.63. She had out in loans at the same time $650. The remainder she had used in various ways. It is manifestly impossible for any human tribunal to say what fund was used to pay for this first tract, and we doubt very much whether Mrs. Yesler ever knew, or thought of making certain, that any particular fund in her hands was used. She had had enough money from her inheritance to pay for all the property in the first class, but no presumption that she used it can be raised from that fact. She expended $450 in a trip to San Francisco, $205 she gave to a sister,

and $1,600 was used in a centennial trip, while $238.62 was paid for mining stocks, and $310 for taxes, and it would be just as accurate a guess to say that these matters absorbed all of her own money, and more, too. The general rule laid down by the courts which have had this subject under consideration most frequently is, that such confusions work a forfeiture of the separate character of property thus purchased. What, then, was the character of the funds commingled by Mrs. Yesler with her own? *First*, There was the board money, which both sides concede was common property, under all the statutes. *Secondly*, The rents and fruits of Mr. Yesler's portion of the donation claim. The land, it is agreed, was his separate property; but appellants contend that the rents and fruits were common, while respondent insists that they were the husband's separate property. Remembering that we are now speaking of rents and profits of the husband's separate real property under the act of 1873, we hold with appellants on this point. The case was argued by the respondent as though rents and profits of the wife's separate real property were in question, and she cited *George v. Ransom*, 15 Cal. 322 (76 Am. Dec. 490), in support. In that case it was held that the legislature could not divert the rents and profits of a wife's separate property from the constitutional channel. But, although the statute there construed was the same in substance as our act of 1873, except that it expressly made the rents and profits of the separate property of both husband and wife community property, it has never been held that the act did not control the husband's separate property, as it was intended to. *Lewis v. Lewis*, 18 Cal. 654. None of the acts of our legislature until 1879 pretend to make the husband's rents, issues and profits his separate property. It could make but little difference, however, whether these rents and fruits were separate or common. In either case, the husband had the absolute power of dis-

position of them, and could do what the respondent claims he did do, viz., make a gift of them to his wife so as to vest them in her separately. If they were so given to her there would, perhaps, be no question of confusion of property, as the whole fund would then be hers.

Concerning the question whether these rents and fruits were given to Mrs. Yesler by her husband, there is this information in the stipulation, and no more:

"1. Mrs. Yesler received the following sums of money for rents of buildings owned by Mr. Yesler on his donation claim at Seattle, which she had and used, with the permission of Mr. Yesler, for her own account to wit:

"2. As early as 1873 Mr. Yesler had on his claim a couple of orchards which were cultivated by him, and Mrs. Yesler, with his permission, sold fruits and produce therefrom, and used the proceeds.",

From these meager facts but little, if anything, can be argued to sustain the conclusion that these sums were gifts to Mrs. Yesler. Under the act of 1873, the wife's separate property was subject to the management and control of her husband. A gift to her would still have been at his disposal so long as it remained in money (§ 6.) Therefore, to make a gift effectual to her, the same degree of certainty was necessary which would have been required by statute. Says Schouler's Husband and Wife, § 385, concerning this matter of gifts to a wife:

"The evidence of intention should be clear and distinct in such cases. There should be a clear irrevocable gift to a trustee for the wife, or some positive act by the husband, by which he divests himself of the property, and engages to hold it for the wife's separate use."

See *Parker v. Chance*, 11 Tex. 513. *McDermott's Appeal*, 106 Pa. St. 358, 51 Am. Rep. 526, says of money deposited by a wife in her own name in a savings bank:

"Her possession of it was his possession, as much so as if she had kept the money in a safe or a bureau instead of

in the bank.  It is a common thing in everyday experience for a woman to have the possession and control of her husband's money, and the husband of the wife's, and if from such fact we were to draw the conclusion that the custodian was the owner of the money, it would lead to unexpected results."

We cannot regard such cases as *Higgins v. Johnson's Heirs,* 20 Tex. 390, 70 Am. Dec. 394; *Story v. Marshall,* 24 Tex. 308, 76 Am. Dec. 106, and *Peck v. Vandenberg,* 30 Cal. 11, cited by respondent, as in point here.  The first case held that it might be established that real estate conveyed to a wife was her separate property by showing that at the time of the purchase her husband declared it to be his intention to make it so; in the second, a deed of community real property from the husband directly to the wife was upheld as a gift upon the ground that to hold otherwise would be to render the deed wholly inoperative and void; the last named case decided that parol testimony was admissible to show that land conveyed by a mother to her married daughter by a deed expressing a nominal money consideration was in fact a gift.  The prominent feature in all these cases is the liberality of the courts in admitting parol testimony to show the real *status* of lands conveyed to married persons, in spite of the presumptions arising from deeds of conveyance; and, if they have any bearing at all upon the question in discussion, they emphasize the text quoted from Schouler, that there must be some positive act on the part of either spouse to predicate a claim of gift upon.  It is argued that the duty was cast, by the statute, upon Mr. Yesler, to hold, manage, control and dispose of the common property, and that not having done so a gift should be presumed.  He certainly had the authority of the statute for doing so, but there was nothing which precluded him from entrusting the management and disposition of it to his wife, without the loss of any title whatever.  It would be strange indeed if a man so fortunate as to have a

wife of eminent business qualifications, might not entrust the investment and management of any part of their common fortune to her without losing his entire interest in it, unless he first protected himself by written reservation or its equivalent. The record as quoted shows nothing but a permission. It is true that with reference to the rents it is stipulated that she had and used them "for her own account;" but nothing definite can be construed out of this expression. It may just as well mean that these sums were for her "pin money," which she was free to use, but the savings from which would not be her separate property at all.

There were certain things, however, which respondent claims should be considered as admissions of Mr. Yesler, that the lands of the first class at least were his wife's separate property. The first of these are the inventories. The two filed in 1871 and 1873 (exhibits 8 and P) seem to have no relevancy to the present case. Both were filed before the act of 1873, and more than two years before any of the property in question was acquired. But following her purchases, excepting the last, under the act of 1873, Mrs. Yesler filed two inventories in the office of the county auditor, in which she described the real estate recently acquired, and declared it to be her separate property "free from the control of any other person or persons whomsoever," in the first one, and "free from any and all liabilities whatsoever for any debts or liabilities of my said husband," in the second. Again, January 31 and March 5, 1879 (still under the act of 1873), she filed inventories describing certain promissory notes and mortgages to secure the same, which she also claimed to have "free from the control of my said husband." Concerning these inventories, we observe, first, that no notice is brought home to Mr. Yesler either of the purchase of the lands or of the acquisitions of the notes and mortgages, or of the making

or filing of the inventories, although by this we do not desire to imply that with full notice he would have been called upon to act in any wise in hostility to his wife's possession or claim, for as between him and her neither claims nor silence could effect much, if anything. The inventory of 1873, totally unlike that of 1871, did not require the husband's joinder, and merely served as notice to creditors that her separate property which was, by the statute, under the management and control of her husband, was entitled to exemption from execution upon his debts. Failing to file an inventory, she waived the exemption (§ 5). The inventory was purely a self-serving declaration which was scarcely admissible in evidence for any purpose, as an inventory, except to show as against creditors that it had been made and filed. *Sullivan v. Mc-Millan*, 26 Fla. 543.

But in the second place, referring to what are claimed by the respondent to be admissions, there is a power of attorney of date December 8, 1875. It was executed by both the Yeslers, and empowers Manville S. Booth to grant, bargain, sell, convey, etc., "the following described real estate belonging to the said Sarah B. Yesler, as her separate property, now of record in said county, to wit," etc. This instrument, containing as it does a flat statement participated in by Mr. Yesler, that the lands therein described are those "belonging" to Mrs. Yesler as her separate property, and considering that the record title was already in her, we hold is sufficient evidence, in a case like the one under consideration, from which to conclude that the property mentioned therein was hers through purchase out of her separate money, or through previous gift, and should now, in the absence of anything to contradict or explain the declaration, be held to be her separate property. We can well see that such a declaration might be of no force as against creditors, since it might as to them be wholly

self-serving; but as between husband and wife, it is against interest, and is entitled to consideration accordingly. That the power was revoked in 1886 can make no difference; it was merely the authority to Mr. Booth that was withdrawn, not the admission to which we have alluded. The like conclusion is not deducible in regard to lot 8, block 35, Boren's plat of Seattle, from the contract made between the Yeslers and Mary Booth, August 6, 1876. Under that contract the sum of $1,600, the consideration for the conveyance of the lot, was to be Mrs. Yesler's separate property when received, but that fact does not carry with it a presumption that, if the contract was not carried out, the lot itself was, or was to be, hers.

We now pass from the property of the first class. The property of the second class we have held to have been acquired under the act of 1881, and the only attention which need be paid to the act of 1879 is to note, in passing, that it appears in the case that on July 23, 1880, Mrs. Yesler loaned Mary A. Droughton $1,000, which was repaid November 18, with the addition of $50 interest, while the law was, if anything, more exacting with regard to married women's inventories than at any time previously. The third section provided:

"A full and complete inventory of the separate property of the wife shall be made out and signed by her, and she shall also verify the same before an officer authorized to administer oaths, to the effect that the property therein mentioned is her separate personal property, and such inventory must be recorded in the office of the auditor of the county in which the wife resides."

She also held a patent tax book, gas stock and mining stock, which had cost her over $5,000. None of this property was inventoried, and it is a fair inference that she was not claiming it as her separate property; as the law then existing, in addition to the provision we have quoted,

was so stringent in its terms and peculiar in its provisions, that it seems probable that one who, like Mrs. Yesler, had been particular in the matter of filing inventories before, would have kept up her practice begun in 1871.

The first two purchases of the second class were made January 6, 1882 (exhibits K and L), for $867.62, and if any dependance at all is to be placed in the "account" of Mrs. Yesler's financial affairs, which is presented by the respondent, these purchases were certainly made in part with money then recently received from Mr. Yesler's rents and fruits, which were his separate property under the act of 1879. In August, 1881, Mrs. Yesler, according to this account, received from these sources $1,050, and this was the last money she had prior to January 6, 1882. After the purchases were made, she is shown by the account to have had a balance of $531.17. Therefore, immediately prior to the purchases she had $1,398.79, of which but $348.79 could have been her separate money, which, supposing she used it all in making the purchases, would leave $518.83, which must have been made up from the $1,050 received from Mr. Yesler. There is absolutely no evidence that any such particularity was exercised by her, or that any of the $348.79 was her separate property, and we have gone into this matter merely to illustrate how unreliable would be any deduction drawn from the "account," or any of the facts of that class which are claimed to show the separate character of this property.

It is agreed that on February 16, 1882, Mrs. Yesler borrowed from McElroy $2,200, the repayment of which she secured by giving a mortgage upon her donation claim; and with $2,000 of this money she bought land from Reynolds which she sold to Hunt. Her cash balance after this purchase is alleged in the "account" to be $731.17, which is precisely the balance left after her purchase of January 6, 1882, with $200 added from the McElroy

money.  On June 6 following, the "account" estimates that she had received from "rents and fruits" $350.  This made her total cash on hand $1,081.17.  Yet it is a conceded fact that on the last named day she paid $3,000 for the real estate described in exhibit I, a clear outlay of $1,918.83 more money than she had.  It is perfectly evident that there is a screw loose in the "account," and we are left without any knowledge whatever as to where the balance of the funds did come from to make this purchase. This state of things is peculiarly unfortunate, as there was included in this purchase the undivided half of the land afterward platted by Mrs. Yesler, and from which her only sales of real estate, with two exceptions, were made.  April 9, 1883, Mrs. Yesler borrowed from Starr $5,300 upon another mortgage of her donation claim, and with this money paid off the McElroy mortgage, and with $400 more, derived from "rents and fruits," bought the remaining half of the platted tract and other lands for $3,-500.  The interest on the McElroy mortgage, $239, she also paid out of "rents and fruits," according to the "account."  In June, 1887, she sold to Hunt the land purchased with the McElroy loan, and a part of that purchased with the Starr loan for $10,000, and from that sum paid the principal and interest of the Starr loan, $7,420.  Thus the investment of $5,300 of money borrowed on the credit of her separate estate and $839 derived from "rents and fruits," produced an apparent profit of $2,520 in money and the lands included in exhibit M not sold to Hunt. Having received no money whatever from April 9, 1883, to June 28 of the same year, she, nevertheless, on the latter date paid out $1,994 for clearing her addition, and gave to Amos Burgert, seemingly a relative, $1,800, another instance of the unreliability of the "account."

The question of most importance affecting the second class of lands is, whether their having been purchased with

borrowed money changes their community character. The money borrowed is not acquired by gift, bequest, devise or descent; nor is it a substitute for the separate property upon which a mortgage may be given to secure it, upon the theory of exchange, since the estate has not been parted with or diminished, except in a temporary and potential sense. Neither is such money, "rents, issues or profits," although the last mentioned term be extended to include accumulations. There can be no doubt that if a married woman, under the act of 1881, borrows money entirely upon her personal credit, the money and whatever she buys with it becomes common property, though counsel for respondent does not admit this proposition. Indeed, he argues that under the terms of the first and eleventh sections (Gen. Stat, §§ 1408 and 1410) there is at this time no such thing in this state as common property between husband and wife, except such as may have existed prior to the act, and the rents, issues, profits, proceeds and conversions thereof, though we think the personal earnings of the husband must have been overlooked by him in formulating that proposition. The new liberty of the wife to contract and enjoy property furnishes the main basis for the argument. But we see nothing in the necessities of the wife's present condition that did not previously exist as to the husband when he alone enjoyed the freedom of contract, but was subject to the common property rules. Nothing was then urged against depriving him of his "rights" by diverting not only his earnings and accumulations, but his rents, issues and profits as well, to the use of the community, and we see no reason or purpose in the present law to extend its effect in favor of either husband or wife beyond its plain letter or necessary implication. It contemplates that there will be community property, and makes such elaborate provision for its disposition, both before and after the death of the parties, as to preclude the possibility that

nothing but the mere fragments from the old dispensation were legislated for.

But to return. If borrowed money is community property, how can the voluntary act of either spouse in securing its repayment by mortgage of separate property change its character? If the husband borrows $1,000 upon his own note secured by his wife's mortgage of her separate realty, whose money is it? If the security determines the ownership, it must be hers, and if he buys land with it, taking the title to himself, the land must be hers and he her trustee. But if he sells part of the land for sufficient to pay the note and discharge the mortgage, or uses his earnings for the same purpose, or sells all the land for a large advance, to whom does the profit in land or money belong? To tread a single step from the course laid out by the statute would make such questions practical. In *Schuyler v. Broughton,* 70 Cal. 282, it was held that where the purchase price of land conveyed to the wife was paid by her in part from her separate funds and in part with money borrowed upon a mortgage of the same land, that proportion of the land paid for with the borrowed money was community property, and the remainder was her separate property. The opinion by McKee, J., implied that if the mortgage had been upon existing separate property of the wife, the decision might have been different. But in *Heidenheimer v. McKeen,* 63 Tex. 229, the precise point was in issue, and was decided, as we think, according to the better rule. There merchandise was bought with money borrowed by the wife upon a deed of trust of her real estate, and it was said:

"Suppose that the debt incurred in securing the loan had been paid without any resort whatever to the deed of trust, it would not be insisted, we apprehend, that the money or merchandise either became the separate property of the wife simply because her real estate had been used as a security for the debt.

"If the money had been borrowed upon the faith of a deed of trust given upon the separate property of the husband, certainly the money nor the merchandise either would for that reason become his separate property.

"In either case the *status* of the property is to be determined at the time when the loan is secured."

In this case the land purchased with the borrowed money paid for itself, and a large profit in land and money besides. It was a speculation purely personal in which the energy, skill and business prudence of Mrs. Yesler certainly were greater factors than the credit given by the mortgage of her land. But these mental forces, whether of husband or wife, are servants of the community, and their products are its property, to be shared in equally by the members of the community, and to follow the channels of devise and descent provided by the statute.

Respondent claims a point because when Mr. Yesler, who was also a large borrower from Starr, was arranging his matters with him, in 1884, Mrs. Yesler's note and mortgage for $5,300 were assigned to him by Starr. The assignment dated at San Francisco, June 25, 1884, is here, and with a statement of Starr's account with Yesler of date June 4, 1884, in which he is charged with $5,332.40 principle and interest of Mrs. Yesler's note, which amount was deducted from $50,000 that day loaned. But the note was still left with Starr's agent to whom the money was paid on the sale to Hunt, and placed to the credit of Yesler. The substance of this transaction seems to be that Mr. Yesler was merely protecting the note given by his wife, which was then past due, with monthly interest unpaid, and that he continued to do so for three years until the property paid it off, receiving nothing for the accommodation. Why should he do this, and why should the note be charged to his account if her loan was an entirely independent transaction, in which he had and could have no interest? It might have been because he, as her hus-

band was willing to do more for her than he would be likely to for a stranger; but things which might have been are not sufficient to overcome the legal presumptions created by the statutes.

The fact that Mr. Yesler joined in all the deeds made by his wife from the tract platted by her as "Sarah B. Yesler's Addition," is argued to be an admission on his part that this was her separate property, for the reason that as she alone had executed the recorded plat, he by joining in deeds describing property according to the plat, admitted that she had authority to do so as sole owner. The proposition is fairly met by the fact that he joined in all the deeds she ever executed, and by the query, Why should he have joined in the deeds for the lots in her plat at all since, under the act of 1881, it was not necessary for him to join in conveyances of his wife's separate property? He did not join in her mortgages to McElroy and Starr upon her donation claim; why should he have placed himself under the obligations imposed by numerous warranty deeds, if it was not necessary? It may be said that purchasers seeing the title in her name would not be satisfied with a conveyance without his joinder, and that may be the solution of it, but it would only be a guess to so solve it. The juster inference seems to be, if there be any just inference at all, from these deeds, that by joining in their execution, Mr. Yesler was treating these lots as community property, in the sale of which he had an interest; otherwise, a single quit claim to her would have relieved him of trouble and responsibility; a small consideration to be sure, but this is a case where small circumstances are all that appear. He recognized the plat, of course, by the reference in his deeds; but the recognition was for the mere purpose of description, and not for title. Had the plat been filed by a perfect stranger the legal effect of the deeds would be the same, both as to the land conveyed and the dedication of streets.

These views require a reversal of the decree of distribution as to all the lands in controversy, excepting those described in the power of attorney to Manville S. Booth (exhibit 2); but before remanding the cause there is one other matter which requires to be disposed of. Appellants maintain that inasmuch as only the respondent here appealed from the order of distribution entered in the probate court, the other heirs of Mrs. Yesler were cut off from any participation in the benefits arising from the new decree entered in the superior court, a part of which this court now affirms. We agree with the superior court in this matter: *First*, Because the proceeding is one *in rem*, primarily to decide the *status* of the property; and, *secondly*, because under chapter 114 of the Code of 1881, appeals from probate courts were taken in the same manner as from justice courts. This involved trial *de novo* and a new decree. The whole cause was transferred to the superior court, never to be returned thereto. Therefore the adjudication in the superior court was of the *status* of the entire property, and its decree was correct in that it found the land described in the Booth power of attorney separate property, and distributed it to the husband and heirs at law in equal moieties.

We think it will be for the convenience of parties that the cause be remanded to the superior court, with instructions to set aside the decree appealed from, and enter a new decree, distributing the donation lands, the "Wilson farm" and the real estate described in the Booth power of attorney to the parties as before, and the remainder of the property in controversy to Mr. Yesler as the community property of himself and Mrs. Yesler, and it is so ordered. As between the heirs-at-law, including Mr. Yesler, the respondent here should be allowed, out of the separate estate, all her costs of both appeals.

ANDERS, C. J., and HOYT, SCOTT and DUNBAR, JJ., concur.