JESSIE GAIR SWEENEY, EXECUTRIX, ESTATE OF EDWARD F. SWEENEY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 6322.   Promulgated April 9, 1929.

*E. S. McCord, Esq.*, for the petitioner.
*L. S. Pendleton, Esq.*, for the respondent.

## OPINION.

Van Fossan: In Remington's Compiled Statutes of Washington, 1922, we find the following provisions as to the status of property of a marital community in that State:

Sec. 6890. Property and pecuniary rights owned by the husband before marriage, and that acquired by him afterward by gift, bequest, devise or descent, with the rents, issues and profits thereof, shall not be subject to the debts or contracts of his wife, and he may manage, lease, sell, convey, encumber or devise by will, such property without the wife joining in such management, alienation, or encumbrance, as fully and to the same effect as though he were unmarried.

Sec. 6891. The property and pecuniary rights of every married woman at the time of her marriage, or afterward acquired by gift, devise, or inheritance, with the rents, issues, and profits thereof, shall not be subject to the debts or contracts of her husband, and she may manage, lease, sell, convey, encumber or devise by will such property, to the same extent and in the same manner that her husband can, property belonging to him.

SEC. 6892. Property, not acquired or owned as prescribed in the next two preceding sections, acquired after marriage by either husband or wife, or both, is community property. The husband shall have the management and control of community personal property, with a like power of disposition as he has of his separate personal property, except he shall not devise by will more than one half thereof.

In the case of *Brown's Estate*, 124 Wash. 273; 214 Pac. 10, the Supreme Court of the State of Washington enunciated the following cardinal principles governing the status of community and separate property in that State:

1. The presumption is that property acquired during coverture is community property, and the burden is upon the person claiming it to be separate property to establish that as its character.

2. The status of property is to be determined as of the date of acquisition. This rule is equally true with regard to personal property as with real property.

3. If property is once shown to have been separate property, the presumption continues that it is separate until overcome by evidence. Separate property continues to be separate through all its changes and transitions, so long as it can be clearly traced and identified.

4. The rents, issues, and profits of separate property remain separate property and profits resulting from money borrowed on separate credit are separate property.

5. Separate property may lose its identity as such by being consolidated with community property.

The decisions by the Supreme Court of Washington have established that there are at least two situations in which the above provisions of the law are circumvented or superseded. These are where there is an agreement between the parties abrogating the property status established by statute (*Dobbins* v. *Dexter Horton & Co.*, 62 Wash. 423; 113 Pac. 1088; *Gage* v. *Gage*, 78 Wash. 262; 138 Pac. 886; *Union Securities Co.* v. *Smith*, 93 Wash. 115; 160 Pac. 304; *Volz* v. *Zang*, 113 Wash. 378; 194 Pac. 409) or where there is such a commingling of separate and community property as to make it impossible to trace or distinguish the separate elements. *Yesler* v. *Hochstettler*, 4 Wash. 349; 30 Pac. 398; *In re Williams' Estate*, 145 Wash. 19; 258 Pac. 851.

The evidence clearly establishes that by reason of her impending inheritance from her father Jessie Gair Sweeney's financial standing was much superior to that of her husband. It is also established that when her financial aid was sought by her husband she objected to lending her name to the projects until he assured her and agreed that all of the property then in his name or to be acquired by him was to be considered as community property. The acknowledgment by decedent of this changed status was often made to Mrs. Sweeney and to those associated with them in business transactions. Solely by reason of this agreement, Mrs. Sweeney lent her name and financial standing to decedent's business activities and signed as maker or

endorser notes aggregating hundreds of thousands of dollars. Under the decisions cited, such an agreement in respect to personal property made after marriage and mutually observed and acted on is valid. The only property here involved was personal property. Our decision might well rest on this agreement, but there is a further basis in the treatment and commingling by the parties of the property and funds.

At the time of his marriage the decedent's property consisted of stock in the Seattle Brewing & Malting Co., which he sold in 1905 for $125,000, and certain unimproved lots in the City of Seattle. One of these lots, No. 4 in block 5 in A. A. Denny's Addition had been purchased by the decedent in 1897 for $12,000 and was conveyed by him and Jessie Gair Sweeney to the Edward F. Sweeney Investment Co. for the purpose of erecting a hotel building thereon. Such a building, known as the Hotel Savoy, was constructed at a cost of $350,000. In all of the transactions connected with this building operation, including the acquisition of the additional necessary funds by loan and otherwise, Mrs. Sweeney fully participated.

The value of the lots owned by the decedent prior to his marriage and conveyed to the Gair Realty Co. in 1916 was less than $25,000. On these lots there were erected buildings costing many times the value of the land. The funds obtained for that purpose came from the contributions of Jessie Gair Sweeney, loans negotiated by utilizing her credit, the individual earnings of the decedent, and the profits arising from the community business. There was no segregation of the funds on the basis of their origin. No specific contribution was devoted to any particular purpose, but the entire revenues of the community were combined and merged into a common fund and were used indiscriminately for the common object. Thus, in both instances the property which originally was the separate property of the decedent lost its identity in the later developments. The bare title to the real estate can be traced but we can not determine what portion of the present value of the properties is allocable to the land and what portion to the improvements thereon. The two elements are so interwoven as to defy separation. The improvements were made largely from community funds; they are the result of the activities of both the husband and the wife, and in their production the wife's credit standing was a large, if not the principal, contributing factor.

As above stated, where separate and community property have become so intermingled, commingled and merged as to make segregation difficult or impossible, the whole is treated as community property. *Yesler* v. *Hochstettler, supra; Buchanan's Estate,* 89 Wash. 172; 154 Pac. 129; *Carmack's Estate,* 133 Wash. 374; 233 Pac. 942.

In the case *In re Williams' Estate, supra*, the court said:

It was the mixing of these funds, derived from different sources, and the payment out of those funds, together with any other funds he may have used for the purchase and improvement of property or making improvements on his separate property, that constituted such a commingling of funds as to defy segregation (with one exception to be mentioned on the appeal of the executors) and led the court to find and determine that certain of the property was community property.

The principles set forth above have been applied by us in several cases relating to income from community and separate property. *Julius and Rebecca B. Shafer*, 2 B. T. A. 640; *W. J. Rucker et al.*, 9 B. T. A. 915; and *Anna L. Compton, Executrix*, 11 B. T. A. 26. In the case under consideration the value of the unimproved real estate was not comparable to the value of the improvements and the increments attributable to the community property, neither is it possible to determine the proportionate value of these two elements.

In consideration both of the commingling of the property and of the express agreement between the parties, we hold that the entire property formerly owned by the decedent and Jessie Gair Sweeney and represented by the capital stock of the Edward F. Sweeney Investment Co. and the Gair Realty Co., held in the name of the decedent at his death, was community property.

The respondent determined the value of the stock of the Edward F. Sweeney Investment Co. to be $213,456.68. The petitioner has not shown this to be in error. The respondent has determined the value of the Gair Realty Company stock to be $99,162.46. Likewise, the petitioner has proven no error in this calculation. These figures should be used as the basis for computing petitioner's tax.

At the time of his death the decedent had advanced to the Sweeney Investment Co. the sum of $17,269.52 in excess of the amounts received by him from that corporation. The moneys so advanced appear to have been derived solely from the decedent's earnings and receipts subsequent to his marriage. Therefore, they constituted community property. *March* v. *Fisher*, 69 Wash. 570; 125 Pac. 951.

The Edward F. Sweeney Investment Co., Edward F. Sweeney, and Jessie Gair Sweeney became joint makers of a note of $25,000 dated April 30, 1918, payable to the Seattle National Bank, and employed the proceeds in community ventures. The loan was continued, reduced and divided into separate obligations. At the time of the decedent's death Jessie Gair Sweeney remained as the joint maker of a renewal note of $10,000, given in lieu of the above obligation, but was not required to execute two smaller notes aggregating $7,850, evidencing the remainder of the debt to the bank. Neither the Edward F. Sweeney Investment Co. nor the estate of the decedent being in a position to pay the obligation, and the bank insisting upon payment, Mrs. Sweeney paid the note from her inde-

pendent funds. A similar situation existed in relation to a loan of $5,000 secured by the Edward F. Sweeney Investment Co. from the Union National Bank, with the exceptions that the proceeds thereof were used by the Gair Realty Co. and Mrs. Sweeney was not a joint maker of the obligation. However, the amounts so borrowed from these two banks were used solely for community enterprises through the two corporations. In *Kuhn* v. *Groll*, 118 Wash. 285, 203 Pac. 44, the Supreme Court of the State of Washington held as follows:

There is a suggestion in the brief of counsel for respondents—though seemingly not seriously argued—that in no event is the community consisting of Burwell and wife liable upon these notes. What we have already said seems to be sufficient to dispose of any such contention, against the community consisting of Burwell and wife. But, even should we regard Burwell as an accommodation maker of these notes, we still think viewing the whole history of the dealings of these parties from the time respondents Groll and Burwell, upon the original purchase of the stock by appellant, agreed to repurchase it from him, manifestly to promote the financial welfare of the San Juan Canning Company, and in turn their own welfare, that all acts done and obligations incurred by Burwell were so connected and intended to redound to the benefit of the business of the community that the signing of these notes became a community obligation. We feel constrained to so hold, especially in view of the presumption that the signing of these notes by Burwell, as maker, was for the benefit of the community. The decisions of this court in *Horton* v. *Donohoe Kelly Banking Co.*, 15 Wash. 399, 46 Pac. 409, 47 Pac. 435, and *Shuey* v. *Holmes*, 22 Wash. 193, 60 Pac. 402, lend support to this conclusion.

In view of what we have said with reference to the complete merging of the interests and the resources of the decedent and his wife into a community relationship, either through corporate or individual channels, we are of the opinion that these two obligations also were community debts.

The respondent's objection to allowing the deduction for the commission of the executrix, amounting to $3,750, was that the same had not yet been paid. In *Samuel E. A. Stearn et al., Executors*, 2 B. T. A. 102, we held such a deduction allowable.

*Judgment will be entered under Rule 50.*