[No. 30072.   Department One.   January 9, 1947.]

*In the Matter of the Estate of* CLARA DOUGHERTY, *Deceased.*
PHILIP D. DOUGHERTY, *Appellant,* v. R. W. MILLER, *as Executor, Respondent.*[1]

[1]Reported in 176 P. (2d) 335.

*Frederick B. Cohen* and *Ronald E. Danielson,* for appellant.

*R. W. Miller,* for respondent.

SCHWELLENBACH, J.—This is an appeal by Philip D. Dougherty, the surviving spouse of Clara Dougherty, deceased, from a decree denying his petition for appointment as administrator of her estate with will annexed.

Mrs. Dougherty died November 30, 1945, leaving an estate in Kitsap county. December 6, 1945, her nonintervention will was admitted to probate, devising all her property to LaRue Myers, a daughter, and naming R. W. Miller as executor and trustee under the will.

Clara Thomas moved to Bremerton from Vancouver, B. C., in 1939, and opened the Dixie Rooms as a house of prostitution. Later, in addition to the operation of the Dixie Rooms, she leased the Gates hotel from the Bremer estate and purchased the furniture and equipment therein for

five thousand dollars under a conditional sales contract. This was on October 13, 1939. In 1940, the Bremer estate made a deal with the J. C. Penney Company to erect a building on the property where the Gates hotel was located. The hotel was moved to a new location and its name changed to the Clare hotel. Negotiations were had with Mrs. Thomas concerning the sale of the hotel, including the financing. When the papers were ready to be executed, it was discovered that her name was Dougherty, she having married Philip D. Dougherty March 1, 1941. All papers were then prepared to include the names of both Mr. and Mrs. Dougherty.

Shortly after their marriage, a home was purchased for forty-six hundred dollars. There was a down payment made of one thousand dollars, and a mortgage for thirty-six hundred dollars was executed April 22, 1941, to the First Federal Savings & Loan Association of Bremerton. In this transaction, in both the mortgage and the deed, the names of "Philip Dewey Dougherty and Clara Dougherty, husband and wife" appeared. On June 10, 1941, Dougherty executed a power of attorney to his wife, but limited it to the real and personal property and equipment located in the Clare hotel. This power of attorney was revoked August 22, 1944.

Prior to her marriage, she had an account in the Bremerton Trust & Savings Bank. Although the amount is not definite, the testimony indicates that the balance was usually substantial. Some time after the marriage (the date is uncertain, but the first checks issued by him were on August 18, 1941), the husband signed the signature card, after which both parties checked against the account. Mr. Roy Noyes, the president of the bank, testified that she had specifically asked him to notify her in case any large checks should come through; that if they thought the amounts excessive, they should call her; and that sometimes she would have the whole balance transferred to her individual account.

Mr. Dougherty was in the navy. He was stationed in Tacoma during the first year of their marriage, and, then,

for a year and a half, stationed in Seattle. Commencing November 5, 1942, he made an allotment of fifty dollars a month to his wife. This continued until December, 1943, when it was increased to one hundred dollars a month. The allotments ended October 31, 1944, when he was separated from the service, and totaled sixteen hundred dollars. The allotment money and his pay checks constituted his total contribution to the bank account. During this time, he issued checks against the fund in the amount of six thousand dollars, although there is testimony that part of this amount was used for the benefit of the community and of the business.

Dougherty maintained an apartment in Seattle and spent considerable time and money in night clubs. He usually came to Bremerton over weekends. While there, he assisted in the hotel by checking the books and receipts and making repairs. At times, he spent the night there, renting rooms, looking after the laundry for the guests, and calling them in the morning. At one time, there were complaints against the operation of the hotel, it having been reported that taxicab drivers were bringing sailors and young girls there. Dougherty and Mrs. Dougherty went down to the police station in answer to a call concerning the complaints. In the conversation at the police station, he did most of the talking and made arrangements to eliminate the cause for complaints.

The parties did not get along. They quarreled and separated at various times, and then went back together again. Finally, in the latter part of 1944, she commenced a divorce action. She was granted a divorce, and all the property, both real and personal, was awarded to her as her separate property. It was held that a ruby tie clasp studded with diamonds, worth about two hundred twenty-five dollars, a diamond ring, valued at twenty-five hundred dollars, and a diamond-studded wrist watch, worth about five hundred dollars, had merely been given to him to wear, and were declared to be her property. The husband appealed to this court, and pending the appeal, Clara Dougherty died, and the appeal was dismissed.

In this matter, the trial court made similar findings as to the status of the property and as to the articles of jewelry, except that, as to the wrist watch, it was held that the gift to the husband had been completed.

Fifteen assignments of error are urged in this appeal. Briefly, they are based on the admission in evidence of the transcribed testimony of Mrs. Dougherty as given in the divorce proceedings; the refusal to admit certain testimony; the entering of the findings and conclusions as to the items of wearing apparel; and the findings and conclusions holding all the property to be the separate property of the deceased.

We find no merit in the claimed errors in refusing to admit certain testimony offered by appellant, and will not discuss them. As to the tie clasp and diamond ring, although there was a conflict in the testimony, there was sufficient evidence to warrant the findings of the trial court, and its rulings thereon are upheld.

The transcribed testimony, in full, including direct and cross examination of Clara Dougherty in the divorce proceedings, was offered and admitted in evidence in this trial. This was done under authority of Rem. Rev. Stat., § 1247 [P.P.C. § 43-11], reading as follows:

"The testimony of any witness, deceased, or out of the state, or for any other sufficient cause unable to appear and testify, given in a former action or proceeding, or in a former trial of the same cause or proceeding when reported by a stenographer, or reduced to writing, and certified by the trial judge, upon three days' notice to the opposite party or parties, together with service of a copy of the testimony proposed to be used may be given in evidence in the trial of any civil action or proceeding, where it is between the same parties and relates to the same matter."

In *Arsnow v. Red Top Cab Co.*, 159 Wash. 137, 292 Pac. 436, Mr. Arsnow had sued the cab company for injuries he sustained in an accident. The jury failed to agree, and a mistrial resulted. Three days after the trial, Mr. Arsnow committed suicide. His widow, having been appointed administratrix of his estate, filed an amended complaint, setting up two causes of action: one for his injuries and the

other for damages to herself, based on his injuries and resulting death. His testimony in the former trial was read. In reversing the judgment, this court held that, as to the second cause of action, the suit was not waged by the same parties. The second cause of action was never his but hers alone.

Another case interpreting this statute was *Duffy v. Blake,* 91 Wash. 140, 157 Pac. 480. As part payment of the purchase of stock, Duffy gave Blake a note for two thousand dollars. The note was sold by Blake to the American Mortgage & Guaranty Company, and subsequently passed to one Wells by endorsement. Wells sued Duffy on the note, Duffy defending on the plea of fraudulent representations made by Blake, setting up the same fraudulent representations relied on in *Duffy v. Blake, supra.* The lower court made no finding on the issue of fraud, but held that Wells was a holder in due course and entitled to recover. At the trial of *Duffy v. Blake, supra,* there was admitted a transcript of the testimony of a witness in the case of *Wells v. Duffy,* 69 Wash. 310, 124 Pac. 907. In reversing the trial court, this court said, p. 142:

"Under this statute the testimony to be available must be given in a former trial of the same cause. This testimony was not so given. The case of *Wells v. Duffy* was not a former trial of this same case. Neither was it between the same parties, nor upon the same subject-matter. Statutory rights of this character cannot be extended beyond the language of the privilege, and if the statute is relied upon it must be plain that it covers the offer. We are, therefore, of the opinion that the testimony was not admissible under the statute. . . .

"The question now raised is, Is there privity between Wells in that action and Blake in this action? 'Privity' is variously defined. In general, it denotes a mutual or successive relationship to the same right of property or subject-matter, or partakes in an interest in any action or thing. *Douthitt v. MacCulsky,* 11 Wash. 601, 40 Pac. 186. Where, as here, it is sought to establish the relation because of what has transpired in a former action, it is essential that there be an identity of issue. The two actions must concern the same subject-matter, and the proof must be directed to a fact material in both cases. 2 Chamberlyne, Modern Law

of Evidence, § 1664. The above general rule is to be read with this distinction: that the ground of privity is property, not personal relation; and where, as here, the relation is sought to be predicated upon what has transpired in a former action, it is essential that there be an absolute identity of interest. Based upon this essential, the rule has become established that the fact that two parties litigant in two different suits happened to be interested in proving or disproving the same facts creates no privity between them. [Citing authorities.]

" . . . In the *Wells* case, the issue was whether or not the party was a holder in due course of the note upon which the action was brought. Being such a holder, it was immaterial whether or not the note was obtained by fraud, so that while the fraud of Blake in obtaining the note was urged as a defense, Wells was only interested in proving he was a holder in due course, and was not interested in disproving the fraud of Blake. In the present case, the only question to be determined is the fraud as between Duffy and Blake. There is no identity between these two issues. The most that can be said is that Duffy in this suit is interested in proving one of the issues he sought to establish in the former suit, which was there material only upon the showing that Wells took the note with knowledge of its fraudulent character, and which became immaterial upon his failure to show that Wells was not a holder in due course. It must also be apparent that the judgment in the *Wells* suit determined there was no privity between Wells and Blake, since if there had been, and Blake had been guilty of fraud in obtaining the note, Wells could not have recovered. Not being in privity with Blake then, it cannot be said that Wells is in privity with Blake now."

■ In the divorce action between Clara Dougherty and Philip D. Dougherty, the issue was as to the status of the bank account, the hotel, and the home, and also the issue as to whether or not she had made a gift of the tie clasp, the wrist watch, and the ring. Those same matters were the issues involved in the present case. Clara Dougherty had died, but her rights were being protected by her executor. This is an action between Philip D. Dougherty and the personal representative of Clara Dougherty. The purpose of § 1247 is to assist the trier of facts in determining the truth of the actual matters in controversy. At the divorce trial, Mrs.

Dougherty had testified under oath and had been subjected to a rigid cross-examination. In this case, the trial court was entitled to the benefit of her former testimony in ascertaining the status of the property in issue. There was no error in admitting the transcript of her former testimony.

■ At the trial in this matter, the appellant first put on his testimony. While he was on the stand, he attempted to testify concerning certain conversations and transactions had with his deceased wife. This was objected to and refused because in violation of Rem. Rev. Stat., § 1211 [P.P.C. § 38-3]. The ruling of the trial court was correct. This had happened before respondent put on his case. But after Mrs. Dougherty's testimony was admitted, had appellant then offered the same proof in rebuttal, it could have been admitted because the reason back of § 1211 had then been eliminated. Her lips were closed in death, but she had spoken posthumously.

■■ A great many cases have been brought before this court involving the question of separate and community property. It would serve no useful purpose to discuss in this opinion many of them. In *In re Binge's Estate*, 5 Wn. (2d) 446, 105 P. (2d) 689, we held, p. 484:

"It is the rule in this state that the status of property, whether real or personal, becomes fixed as of the date of its purchase or acquisition; and that the status, when once fixed, retains its character until changed by agreement of the parties or operation of law. Property acquired through contractual obligation, as between husband and wife and all others claiming under them, has its origin and is acquired as of the date when the obligation becomes binding, and not as of the time when the money is paid or the thing is delivered or conveyed. The fruit of the obligation is legally acquired as of the date when the obligation becomes binding."

"Where property is acquired during marriage, the test of its separate or community character is whether it was acquired by community funds and community credit, or separate funds and the issues and profits thereof; the presumption, which may be rebutted by proof, being that it is community property. If the husband and wife unite in a promissory note secured by mortgage, payable to their

grantor as a part of the purchase price, or, by the same means, borrow the money to be used in payment from a third party, in either event the money borrowed becomes community property, and to that extent the purchased property is community property."

The last case in which the rules governing in the determination of the various problems confronting us have been announced, was in *In re Witte's Estate*, 21 Wn. (2d) 112, 150 P. (2d) 595, decided in July, 1944; and we quote therefrom, p. 124:

"Property and pecuniary rights owned by either husband or wife before marriage or acquired afterwards by gift, bequest, devise, or descent, with the rents, issues, and profits thereof, are his or her separate property; and all other property acquired after marriage by either spouse is community property. Rem. Rev. Stat. §§ 6890, 6891, 6892 [P. C. §§ 1432, 1424, 1433]. [Citing authorities.]

"The status of property, whether real or personal, is to be determined as of the date of its acquisition. [Citing authorities, including *In re Binge's Estate, supra.*]

"The status of property, when once fixed, remains so in character until changed by deed, by agreement of the parties, by operation of law, or by the working of some form of estoppel. *In re Binge's Estate, supra; Conley v. Moe, supra.*

"Separate property continues to be separate property through all of its changes and transitions so long as it can be clearly traced and identified, and its rents, issues, and profits likewise are and continue to be separate property. [Citing authorities.]

"Property acquired by purchase during the marriage status is presumed to be community property, and the burden rests upon the spouse asserting its separate character to establish by clear and satisfactory evidence his or her claim to the contrary. [Citing authorities.]

"Where separate funds have been so commingled with community funds that it is no longer possible to distinguish or apportion them, all of the commingled fund, or the property acquired thereby, is community property. [Citing authorities.]

"The rule last above stated is subject to the qualification that, when the community property is inconsiderable in comparison with the separate property, the mass remains separate property. *In re Binge's Estate, supra.*"

■ With these rules to guide us, let us examine the facts. They were married March 1, 1941. The deal for the home was closed April 22, 1941. There can be no doubt but that the down payment of one thousand dollars was made from her separate funds, and that portion of the entire purchase price was clearly her separate property. The deed was made to both parties. The purchase-money mortgage for thirty-six hundred dollars was executed by Philip D. Dougherty and Clara Dougherty, as husband and wife. There was testimony that this was merely done as a precaution, and that the bank looked to Mrs. Dougherty and the business for its money, rather than to him. In *Riverside Finance Co. v. Griffith,* 140 Wash. 322, 248 Pac. 786, at p. 326, this court said:

"No other deduction can be made from the testimony of appellant, the wife, than that all this property was acquired from the proceeds of property through several transitions and gains that the husband acquired from the sale of his former business, which was incontrovertibly separate property. These proceeds and the gains thereof were clearly traceable from the transactions testified to by the wife. Nor does the circumstance that, in purchasing the most valuable piece of property acquired by the husband after the sale of his business, a mortgage was given signed by both himself and his wife to the vendor for a portion of the purchase price render the property community property. It is well known that vendors, when dealing with purchasers who are married at the time, generally require both spouses to join in the conveyances and incumbrances for safety, by estopping the other spouse from afterwards attacking the transactions.

"The record is clear that the husband's separate funds purchased these properties, notwithstanding the fact that the mortgage was executed by both the husband and the wife. The community, as such, contributed nothing to its acquisition. [Citing authorities.]"

However, *Walker v. Fowler,* 155 Wash. 631, 285 Pac. 649, was a case in which the status of property acquired by the Walkers was involved in this manner: The purchase price was six thousand dollars, of which fifteen hundred dollars was paid in cash, being the proceeds of funds which Mrs.

Walker had inherited from her deceased mother. The balance of forty-five hundred dollars was evidenced by five promissory notes, secured by a purchase-money mortgage, the notes and mortgage being signed by Mr. and Mrs. Walker. The court held, quoting from *Katterhagen v. Meister*, 75 Wash. 112, 134 Pac. 673, p. 634:

" 'Upon the merits of the controversy, we think the learned trial court reached a wrong conclusion in holding that the property was the separate property of George Meister. He paid $1,600 upon the purchase price from his separate funds. To that extent the property was separate. The remainder, or $5,050, was paid by the community. When the husband and wife united in the promissory note, the debt created was a community debt, and the money borrowed upon the note belonged to the community. It is not material whether they borrowed the money of a third party and paid it to the vendor or gave their note direct to him as a part of the purchase price. The rule would be the same in either case. Nor does the fact that the husband later paid the note out of his separate funds change the situation. The status of the property was fixed at the time of the purchase. These views are supported by an unbroken current of decisions in this court. [Citing authorities.]' "

We also said, p. 637:

"Counsel for appellant calls attention to a statement in *Riverside Finance Co. v. Griffith*, 140 Wash. 322, 248 Pac. 786, to the effect that the circumstance that, in purchasing a piece of real property acquired by the husband after the sale of his business (private business owned by him in his own separate right), a mortgage was given signed by both himself and his wife to the vendor for a portion of the purchase price, did not render the property community property. To the extent that the statement embraces that portion of the property represented by the amount of the purchase money mortgage, we are satisfied it is at variance with our earlier cases referred to herein, out of harmony with our subsequent case of *In re Parker's Estate, supra,* and is hereby overruled."

At the time the property was acquired, the community was in existence. The deed was made to both. When they executed the note, the debt created became a community one. Did its character change by operation of law?

Did its character change by agreement of the parties? It should be remembered that, when Dougherty executed the power of attorney, he limited it to the real and personal property located in the Clare hotel. She testified, concerning the purchase of the residence, that she wanted it as a home for him when he got out of the service. We fail to see that the separate character of the home has been established by clear and satisfactory evidence. We hold that, as to the home, 10/46ths was Mrs. Dougherty's separate property, and 36/46ths belonged to the community.

Now, as to the hotel. The purchase price was eighteen thousand dollars. It was handled in this manner: The down payment of ten thousand dollars was loaned by the First Federal Savings & Loan Association of Bremerton, which obtained a first mortgage on the property itself June 17, 1941, executed by "Philip Dewey Dougherty and Clara Dougherty, husband and wife." The balance of eight thousand dollars was secured by a second mortgage on the property, given to the Bremer estate on the same date. To this was added $1,950, the balance due on the contract for the sale of furniture. This mortgage was likewise executed by Mr. and Mrs. Dougherty. The deed, executed June 12, 1941, ran to both parties. The status of this property, at the time of its acquisition, became community property, unless its character was changed by operation of law or by agreement of the parties.

Now, what was the agreement of the parties? What understanding did they have between themselves as to the status of the hotel? Mrs. Dougherty had been operating it for some time under lease. She was buying the furniture. Negotiations were practically completed prior to their marriage for the sale to her. Two days prior to the execution of the deed, Dougherty gave her a power of attorney, limited to the real and personal property located in the Clare hotel. It could be said that this was their method of fixing the status of the hotel between themselves. Of course, if they wanted it to become her separate property, he could have given her a quitclaim deed. But we are considering these two individuals and are endeavoring to determine

what was actually in their minds at this particular time. If this were the entire record, their actions would be very persuasive that they had agreed between themselves, at the time the hotel was being sold, that it was to remain her separate property.

However, Rem. Rev. Stat., § 6894 [P.P.C. § 434-39], provides for the entering into of an agreement between husband and wife concerning the status of the whole or any portion of the community property, to take effect upon the death of either. The statute specifically requires that such agreement be made in writing under the hands and seals of the parties, and to be witnessed, acknowledged, and certified in the same manner as deeds to real estate are required to be. Section 10572, Rem. Rev. Stat. [P.P.C. § 434-45], provides that a husband or wife may give, grant, sell, or convey to the other, his or her community right, title, interest, or estate in all or any portion of their community real property. This conveyance must be by deed. Furthermore, under cross-examination in the divorce case, in regard to the attempted sale of the hotel in 1944, Mrs. Dougherty testified:

"Q. Didn't Jack fight with you about the sale? A. I will say there was no argument whatsoever about the sale of that hotel. Q. You say there was no argument whatsoever about the sale of that hotel? A. Well, no. When I went down to see about selling, the real estate man got a buyer and when I was at the hotel, they called me and this lady said she wanted to buy the hotel. I said, 'Mr. Dougherty will be here around 4 o'clock.' He said, 'Well, could you talk business with her?' But I said, 'I would rather you wait until Mr. Dougherty gets back.' And so Mr. Dougherty came in and talked to them awhile. I knew that I could go ahead with the power of attorney but he was here in town and I wanted to consult with him but I didn't want to go over his head. THE COURT: Why didn't you go through with the deal? THE WITNESS: He didn't want to go through with the deal so I quit. Q. He protested that he didn't want to go through with the deal? A. He told me he didn't want to go through with it."

Here, we have her own admission that, in spite of the power of attorney, she did not go through with the sale

because her husband had objected. After studying the entire record, we cannot conclude that, when the hotel was purchased, or subsequent thereto, there had been any agreement between Dougherty and Mrs. Dougherty that it was to become her separate property. We hold the hotel to be community property and the furniture to be 1950/5000ths community property and 3050/5000ths her separate estate.

■ The inventory showed $5,030.49 in the bank account. There is a strong indication that she considered this as her separate property and only permitted him, by sufferance, to check on it. But the record is not clear as to the amount of the account when they were married. He contributed to the fund. True, he took out much more than he put in. But that would not change the character of the account. After their marriage, any deposits made were for the benefit of the community, whether such deposits were the result of his efforts or hers. We find nothing in the record which would warrant a holding that this account was ever segregated in such a manner that the separate ownership of either could be determined. In *Dupont de Nemours & Co. v. Garrison*, 13 Wn. (2d) 170, 124 P. (2d) 939, we stated, p. 176:

"This court has repeatedly and consistently held that, where separate funds have been so commingled with community funds that it is no longer possible to distinguish or apportion them, all of the commingled fund, or the property acquired thereby, is community property. [Citing authorities.]"

We therefore hold the bank account to be community property.

For the reasons herein assigned, the decree as modified will be remanded, with instructions to the trial court to proceed as indicated in this opinion.

MILLARD, C. J., ROBINSON, JEFFERS, and ABEL, JJ., concur.