[Nos. 1874–3; 1931–3.   Division Three.   September 6, 1977.]

EDNA MAYNA BEAM, *Appellant,* v. ROBERT RAY
BEAM, *Respondent.*

*David H. Putney* and *Halverson, Applegate & McDonald,* for appellant.

*Charles C. Countryman,* for respondent.

GREEN, J.—Two cases were consolidated on appeal and involve two separate actions commenced by Edna Beam against her husband, Robert Beam (1) for dissolution and (2) for personal injury. A decree of dissolution and award of property was entered January 30, 1976. Subsequently, in a separate trial, the jury returned a verdict for Mrs. Beam in the personal injury action. She appeals the granting of a new trial in the personal injury action and the distribution

of property in the dissolution action. We reverse in both cases.

## PERSONAL INJURY APPEAL

The personal injury action was brought by Mrs. Beam to recover damages for injuries inflicted upon her by Mr. Beam. After obtaining a jury award of $59,130, the trial court granted a motion for a new trial, stating that the verdict was "too high" given Mrs. Beam's age and the extent of her injuries under the evidence. The trial court found that the excessive verdict resulted from certain prejudicial remarks occurring during the testimony of Mrs. Beam and closing argument.

Prior to trial, the court granted Mrs. Beam's motion in limine to preclude evidence regarding provocation as a defense to assault. During cross-examination of Mrs. Beam, Mr. Beam's counsel questioned:

Q As a matter of fact, you were accusing him of all sorts of misconduct during that period of time, weren't you?
MR. PUTNEY: I am going to object at this point. We had a motion in limine and there are certain things that the court agrees we weren't going into.
THE COURT: No, I'm going to allow it, that's been opened up, counsel.
Q (By Mr. Countryman) Now, do you understand—
A He brought another woman into my home—
Q Just a moment.
THE COURT: Wait a minute. Wait until he asks the question; then answer the question he asks.
Q (By Mr. Countryman) You accused Bob of a great number of items of misconduct during that evening, didn't you?

During closing rebuttal argument, counsel for Mrs. Beam stated:

And what did he say following the argument that they had that night and following the argument *where Mrs. Beam, as she told you on the stand, was concerned because Mr. Beam had another woman in the house* and they did have an argument, there is no question about that, they had, and they get to this point and he says,

"You so and so, you are monitoring my phone calls now" and takes her on. Now, ladies and gentlemen, isn't that what happened?

(Italics ours.) At this point, Mr. Beam's counsel made no objection but later objected when Mrs. Beam's counsel argued:

I submit to you that the evidence preponderates that that push occurred within a few feet of the wall and the doorway where Mr. Beam had confronted Mrs. Beam and said, "You so and so, now you are monitoring my phone calls"—what sort of statement would a man make after having an argument with a woman about having another woman in the house, "You are checking up on me, aren't . . .

MR. COUNTRYMAN: Your Honor, I object, that's outside all the evidence.

THE COURT: It is and I will admonish counsel that *that is the second time you have made a reference to something that is not in evidence,* and the jury will totally disregard any remark concerning that type of situation.

(Italics ours.) After the jury returned its verdict, a new trial was granted on the basis that the remarks were improper and too prejudicial to be cured by admonition or instruction. We disagree.

A verdict must be accorded a strong presumption of validity. RCW 4.76.030; *James v. Robeck,* 79 Wn.2d 864, 868, 490 P.2d 878 (1971). In passing on a motion for new trial based upon an alleged excessive verdict,

[T]he court should *first look to the scope or range of the evidence in relation to the verdict.* In those instances *where the verdict is reasonably within the range of proven damages,* whether conflicting, disputed or not, and where it can be said that the jury, in exercising its exclusive power, could believe or disbelieve some of it and weigh all of it and remain within the range of the evidence in returning the challenged verdict, *then it cannot be found as a matter of law that the verdict was unmistakably so excessive or inadequate as to show that the jury had been motivated by passion or prejudice solely because of the amount.*

(Italics ours.) *James v. Robeck, supra* at 870–71. Hence, if the verdict is substantially supported by and reasonably within the range of the evidence of damages, it is not, as a matter of law, so excessive in size as to unmistakably show that it was based on passion and prejudice.

Here, the evidence shows several assaults on Mrs. Beam committed by her husband. She suffered a compression fracture of the vertebrae on September 13, 1973, as a result of an assault committed by Mr. Beam. Dr. Roulston, an osteopathic physician, testified that Mrs. Beam was hospitalized for 11 days following the fracture and upon leaving the hospital, she was required to wear a brace, take medication for pain, stay down 80 percent of the time, and complete a series of daily exercises to strengthen her back muscles. On November 9, 1973, she was again admitted to the hospital with contusions to the face, shoulder, upper back, buttocks and thighs resulting from another assault. Again, on March 4, she was treated for multiple bruising and aggravation of an upper back injury. There is substantial evidence from which the jury could have found that all of these injuries resulted from assaults by Mr. Beam.

Dr. Russakov, a physical medicine and rehabilitative specialist, testified that he treated Mrs. Beam between April 8–30, 1975, at the Portland Pain Center in Emanuel Hospital. He determined from her complaints of low back pain, numbness and weakness in the legs, blurred vision, neck pain, pain between the shoulder blades, dull headaches, and lack of energy that she was suffering from chronic pain due to the compression fracture on September 13, 1973. Dr. Russakov gave her a full program of rehabilitation, including exercise and biofeedback, and fitted her with a portable nerve stimulator. He testified that the stimulator did not cure the pain but only treated it, and that Mrs. Beam is required to use the stimulator indefinitely. He concluded that she would not benefit from further medical help and that she was moderately disabled, being able to do only semi–sedentary light work. He stated she cannot stoop or bend repeatedly; she cannot lift over 20

pounds; and she cannot stand or walk for any length of time.

Dr. Gottlieb, a neurosurgeon, first treated Mrs. Beam on October 22, 1974, and found she was suffering from headaches, dorsal and lumbar pain, and pain in the lower extremities. He re-examined her on February 10, 1976, and testified that on the basis of impairment and only considering the loss of bodily function, Mrs. Beam's permanent disability was 30 percent of the whole person.

Two of Mrs. Beam's acquaintances testified that since the injury she seemed to age many years, tired easily, lost considerable weight, and was unable to travel or to participate as she had in the past in art classes and art shows. Mrs. Beam testified that previous to the back injury, she did her own housework and yardwork, painted, participated in many art shows, and taught art. She related, however, that since the injury, she is severely restricted in her activities and, for example, must wear the nerve stimulator at all times, must exercise three times a day, must restrict all her normal movements to keep her back in a certain upright position, can do only minimal housework or yardwork, can only lift 5 to 10 pounds, awakens four to five times per night, cannot participate in the art shows or teach art, and is in constant pain. At the time of trial, Mrs. Beam was 60 years old, and the jury was instructed that based on the mortality tables, "the average expectancy of life of a person aged 60 years is 18.23 years."

From our examination of the record, we are unable to find that quality of certainty which would render the verdict, because of its size, one *unmistakably* motivated by passion and prejudice.

Notwithstanding, a new trial is required if any error of sufficient gravity to warrant a reversal has occurred. *James v. Robeck, supra* at 871. Mr. Beam argues that Mrs. Beam's remarks during cross-examination and those of her counsel during closing argument are so prejudicial as to justify the granting of a new trial. We disagree.

At the time Mrs. Beam made the comment, Mr. Beam's counsel did not request that it be stricken or that the jury be admonished to disregard it. In closing argument, after the second reference to "another woman", Mr. Beam's counsel objected on the basis that it was not "in the record" and the court admonished Mrs. Beam's counsel. However, in the order for new trial, the trial court reasoned that while the statement was unresponsive, it was intentionally interjected to create prejudice.

█ █ We find that Mrs. Beam's answer was in the record because it was received without objection and thus became part of the evidence in the case and may be relied on in argument by counsel. E. Cleary, *McCormick's Handbook of the Law of Evidence* § 54, at 125 (2d ed. 1972). No error can be based upon admission of evidence not objected to at the time it was admitted. *Wagner v. Wagner*, 1 Wn. App. 328, 333, 461 P.2d 577 (1969). If the answer was unresponsive as claimed by Mr. Beam's counsel, he should have objected on that ground and sought to have it stricken. This he did not do. In any event, the answer by Mrs. Beam was not totally unresponsive since the inquiry by Mr. Beam's counsel was directed toward her claim of misconduct by Mr. Beam.

For these reasons, the granting of a new trial was error. Accordingly, the order for new trial is reversed, the verdict of the jury is reinstated, and the case remanded for entry of judgment on the verdict.[1]

---

[1]Mr. Beam cross-appeals in the personal injury action. The original notice of appeal was filed March 24, 1976, but Mr. Beam's notice of cross-appeal was not filed until May 28, 1976. This case is governed by CAROA 33(3) which provides:

[In order for the court of appeals] . . . to obtain jurisdiction, each respondent who desires to prosecute a cross-appeal . . . shall, within twenty days after the giving of the original notice of appeal, file with the clerk . . . a notice of cross-appeal . . .

There is nothing in the record to explain the delay in filing the notice of cross-appeal. Consequently, the cross-appeal cannot be considered timely under the new rules. RAP 18.8. Therefore, it cannot be considered.

DISSOLUTION APPEAL

Mrs. Beam appeals from the decree of dissolution and specifically the trial court's division of property. The two issues set forth in the settlement conference order are whether the court erred in (1) characterizing the corporate stock of Beam Ranches, Inc., as Mr. Beam's separate property, and (2) failing to find that the cash surrender value of certain life insurance policies was community property to the extent of the premiums paid after marriage. On these issues the trial court concluded that Mr. Beam met the burden of establishing by clear and convincing evidence that the real property acquired subsequent to the marriage and transferred to Beam Ranches, Inc., was Mr. Beam's separate property; hence, the corporate stock issued in return was his separate property. The court also determined that since the premiums paid during the marriage on certain life insurance policies were paid by Beam Ranches, Inc., and did not represent community earnings, the insurance was his separate property.

The record shows that after the marriage, real property was purchased. This property, as well as other separate real property acquired by Mr. Beam before marriage, was transferred to Beam Ranches, Inc. In return, corporate stock was issued to Mr. Beam and his son and daughters. The real property acquired after marriage was purchased on contract and the down payment was made in part from a bank loan secured by a pledge of corporate stock owned by Mrs. Beam before marriage. The security agreement and general pledge in favor of the bank to secure the loan for the partial down payment was signed by both parties. The note to the bank was signed by Mr. Beam. Mr. Beam testified that the remainder of the down payment, the amount not being reflected in the record, came from funds from a sale of corporate stock that he owned before marriage. Mr. Beam testified that income from the property transferred to the corporation, consisting of his separate property held before marriage and this parcel in question, paid the balance of the contract.

The trial court acknowledged the community property presumption, but finding no evidence that community funds were used to pay the note or the real estate contract, it concluded the property was the separate property of Mr. Beam. Because of the pledge by Mrs. Beam of her separately owned stock, the court awarded her an equitable lien and judgment in the amount of $12,500. Mrs. Beam argues the court erred in characterizing and considering the property as Mr. Beam's separate property in making the property division. We agree.

■ It is fundamental that property acquired during marriage is presumed to be community property. This presumption can be overcome only by clear and convincing evidence and the burden of proof is on the party claiming the separate nature of the property. *In re Estate of Smith,* 73 Wn.2d 629, 440 P.2d 179 (1968). It may be rebutted by evidence of tracing to show that the consideration for the asset was furnished by one of the parties from separate funds. *Hamlin v. Merlino,* 44 Wn.2d 851, 272 P.2d 125 (1954); *Berol v. Berol,* 37 Wn.2d 380, 223 P.2d 1055 (1950).

■ When different funds are used to make the payments for the purchase of real property under contract, where title does not pass until completion of the payments, the cases are not altogether clear as to the ownership character of that property. *See Fritch v. Fritch,* 53 Wn.2d 496, 335 P.2d 43 (1959); *In re Estate of Dougherty,* 27 Wn.2d 11, 176 P.2d 335 (1947); *In re Estate of Binge,* 5 Wn.2d 446, 105 P.2d 689 (1940); H. Cross, *The Community Property Law in Washington,* 49 Wash. L. Rev. 729, 763 (1974). However, it is well established that the status and character of property becomes *fixed* as of the date of its purchase or acquisition. *In re Estate of Madsen,* 48 Wn.2d 675, 296 P.2d 518 (1956).

> Property acquired through contractual obligation, as between husband and wife . . . *has its origin and is acquired as of the date when the obligation becomes binding, and not as of the time when the money is paid or the thing is delivered or conveyed.* The fruit of the

obligation is legally acquired as of the date when the obligation becomes binding.

(Italics ours.) *In re Estate of Binge, supra* at 484. The ownership of real property becomes fixed when the obligation becomes binding, that is, at the time of execution of the contract of purchase, and the community or separate estates which subsequently make payments on the obligation have the right of reimbursement or equitable lien. *In re Marriage of Harshman*, 18 Wn. App. 116, 567 P.2d 667 (1977).

Here, the evidence reveals that both parties contributed separate property, cash from Mr. Beam and a pledge by Mrs. Beam, in order to obtain the down payment. The obligation to the bank for the down payment loan ran against the community, and the real estate purchase contract named both parties as purchasers. This state of the evidence renders the trial court's conclusion that the property was Mr. Beam's separate property erroneous. We are compelled to conclude that here, where both parties contributed from their separate estates to enable a purchase of property obligating the community, and where it is impossible from the evidence to distinguish or apportion the relative amounts that contributed to the down payment, the property must be deemed community property. *See In re Estate of Witte*, 21 Wn.2d 112, 150 P.2d 595 (1944). This decision is consistent with the whole theory underlying community property laws: that property acquired during marriage by the efforts of both husband and wife is for the benefit of the community. *Togliatti v. Robertson*, 29 Wn.2d 844, 190 P.2d 575 (1948); *Parker v. Parker*, 121 Wash. 24, 207 P. 1062 (1922); *Marston v. Rue*, 92 Wash. 129, 159 P. 111 (1916); *Yesler v. Hochstettler*, 4 Wash. 349, 30 P. 398 (1892). Absent clear and convincing proof of the separate nature of the property acquired during marriage, the community property presumption prevails.[2]

---

[2]Although Mr. Beam testified that his separate property paid the balance on the down payment loan and real estate contract, such testimony without further proof is a self-serving declaration and is insufficient to overcome the presumption

■ Although the trial court's duty is to make a division of the property of the parties, either community or separate, as shall appear just and equitable, RCW 26.09.080, the court must bear in mind the correct characterization of that property as community or separate. *Blood v. Blood,* 69 Wn.2d 680, 419 P.2d 1006 (1966); *Shaffer v. Shaffer,* 43 Wn.2d 629, 262 P.2d 763 (1953); *Pollock v. Pollock,* 7 Wn. App. 394, 399, 499 P.2d 231 (1972). This rule does not compel "strict particularity in listing each asset" as separate or community. *In re Marriage of Hadley,* 88 Wn.2d 649, 656, 565 P.2d 790 (1977). We are also cognizant that proper characterization of the property "is not necessarily controlling; the ultimate question being whether the final division of the property is fair, just and equitable under all the circumstances." *Baker v. Baker,* 80 Wn.2d 736, 745–46, 498 P.2d 315 (1972).

Here, however, the court's erroneous characterization of this parcel of real property requires a reversal. With the change in characterization, we cannot say that the division was just and equitable in spite of the error. Therefore, we remand for reconsideration of the property division in light of our decision.

Finally, Mrs. Beam argues that the community is entitled to a portion of the cash surrender value of the policies of insurance on Mr. Beam's life to the extent of the premiums paid after marriage. The court found, based on the corporation bookkeeper's testimony, that Beam Ranches, Inc., paid all of the premiums on the life insurance during the marriage of the parties. Mrs. Beam argues that these payments were part of Mr. Beam's earnings and are community property. However, the evidence shows that the policies were continuously pledged to the bank in order for the corporation to receive credit. Maintaining the policies

that the property is community. *Berol v. Berol,* 37 Wn.2d 380, 223 P.2d 1055 (1950). With satisfactory proof, however, payment of the balance due by separate funds gives rise to a right of reimbursement but the community ownership of the property does not change. The mere fact that Mr. Beam may have had sufficient separate funds available to make the payments on the purchase contract is insufficient to overcome the presumption. *Hill v. Young,* 7 Wash. 33, 34 P. 144 (1893).

by the corporate payment of the premiums during the parties' marriage was for the benefit of the corporation, even though the beneficiaries listed were Mr. Beam's children, because the bank had the right to receive their cash surrender value. Even when Mr. Beam was not drawing a salary from Beam Ranches, Inc., it nevertheless continued to make the policy premium payments. We agree with the trial court that the payment of premiums by the corporation was noncompensatory and did not constitute community earnings of Mr. Beam. However, in view of our decision that the real property referred to above and transferred to the corporation was community property, the trial court on remand must consider the proportionate share of community funds derived from the rents and profits of this parcel of property that may have contributed to the life insurance premium payments. The community has an interest to the extent it paid partial premiums on the life insurance policies.

Reversed and remanded for further proceedings in accordance with this opinion.

MUNSON, C.J., and McINTURFF, J., concur.

Petition for rehearing denied November 2, 1977.

Review denied by Supreme Court May 12, 1978.