# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In re: | ) | No. 74977-3-I |
| | ) | |
| NANCY WASHBURN, | ) | DIVISION ONE |
| | ) | |
| Appellant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MATTHEW DAVIS, | ) | UNPUBLISHED |
| | ) | |
| Respondent. | ) | FILED: October 23, 2017 |
| | ) | |

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED
2017 OCT 23 AM 10: 28

Cox, J. — Nancy Washburn appeals the trial court's rulings following a bench trial on her petition for dissolution of a committed intimate relationship (CIR) with Matthew Davis. The trial court properly characterized most of the property of the parties. The characterization of one parcel of property as "quasi-community property subject to a 15 [percent] separate lien" was harmless error. The findings of fact were supported by substantial evidence and support the conclusions of law. And the division of the property of the parties was just and equitable. We affirm.

Washburn and Davis moved in together in October 1996. At that time, Washburn was 39, Davis was 26. They each earned less than $30,000 per year.

Davis began working for T-Mobile in 2000, and his income has increased each year. With bonuses, he earned over $400,000 in 2013. Davis is likely to continue to earn at least $100,000 even if he loses his current position. In June 2013, Davis was awarded 15,078 restricted stock units (RSUs) when T-Mobile went public.

Washburn, on the other hand, had to stop working in 2004 due to bilateral tendonitis, a work-related disability. She also has an incurable, progressive autoimmune disease, dermatomyocitis, which requires costly treatments and medication. She is on permanent disability, and receives a monthly income of $3,518.28 from a combination of disability, social security, and a small pension from her late husband.

When the parties moved in together, Davis moved into the home Washburn owned at 32612 SE 108th Street in Issaquah (32612). Together with her late husband, she had purchased 32612 approximately three years earlier for $152,000, incurring debt of approximately $136,000. They had also purchased an adjoining separate lot, Lot 12, for $2,000 because it provided access to 32612 which was otherwise landlocked.

While living together, Washburn and Davis deposited all of their earnings into a joint bank account and paid all of their expenses out of that account. This included the debt secured by the mortgage, property taxes on 32612, and the costs of extensive repairs and remodeling. Davis rented, then sold, his home in Burien and deposited the $49,000 proceeds into this joint account.

In 1997, the parties borrowed $25,000, which was secured by a second mortgage on 32612 to begin some needed repairs. Washburn quit-claimed to Davis a one percent interest in 32612, putting him on the title in order to get the loan. In 2002, the parties refinanced the debt and borrowed $145,000, which was secured by a mortgage. In 2008, Davis used a work bonus of $82,000 to satisfy this loan and release the security. The security instrument then reflected both parties' names.

In 2003, the parties purchased the rental property next door to 32612 at 32611 108th Street (32611) for $175,000. In 2010, they purchased at a foreclosure sale a second rental property adjacent to 32611 at 32607 108th Street (32607) for $224,000. All three properties on SE 108th are landlocked and can only be reached via Lot 12.

Davis moved out of 32612 in October 2013. Washburn commenced this proceeding on March 18, 2014.

Following a week-long bench trial, the trial court entered its findings of fact and conclusions of law, but not its final orders. Davis moved for reconsideration, largely focused on Lot 12 issues. The trial court resolved these issues and entered its final order on division of property. Washburn moved for reconsideration and to set aside the judgment, which the trial court denied.

Washburn appeals.

## CHARACTERIZATION AND DISTRIBUTION OF 32612

Washburn first argues that the trial court incorrectly characterized 32612 as "quasi-community property subject to a 15 [percent] separate lien." Based on

the trial court's alternative ruling characterizing 32612 as Washburn's "separate property subject to an 85 percent community lien" that initial characterization is harmless error.

It is undisputed that the parties were in a CIR.[1] A CIR is "a stable, marital-like relationship" where the parties cohabitate knowing they are not legally married.[2]

Once the trial court finds the existence of a CIR, it evaluates the interest of each party in the property acquired during the relationship and then makes a just and equitable division of that property.[3] In Connell v. Francisco, the supreme court observed that, while "laws involving the distribution of marital property do not directly apply to the division of property following a [CIR][,] Washington courts may look toward those laws for guidance."[4] The court then held that, upon dissolution of a CIR, the trial court may only distribute property that would be considered community property in a marriage.[5] Separate property is not subject to distribution.[6] The character of property, whether separate or community, or in the case of a CIR, quasi-community, is determined at the time of acquisition.[7]

---

[1] Olver v. Fowler, 161 Wn.2d 655, 657 n.1, 168 P.3d 348 (2007).

[2] Connell v. Francisco, 127 Wn.2d 339, 346, 898 P.2d 831 (1995).

[3] Id. at 351.

[4] 127 Wn.2d 339, 349, 898 P.2d 831 (1995).

[5] Id. at 349-50.

[6] Id.

[7] Beam v. Beam, 18 Wn. App. 444, 452, 569 P.2d 719 (1977).

Moreover, the presumption that separate property remains separate is only rebutted by evidence showing that the owner intended to change its character to quasi-community property.[8]

We review de novo whether property is separate or quasi-community as a question of law.[9] We review findings of fact for whether they are supported by substantial evidence.[10] Evidence is substantial if it is sufficient "to persuade a fair-minded person of the truth of the declared premise."[11] Whether the trial court's distribution of the quasi-community property is just and equitable is reviewed for abuse of discretion.[12]

Here, the trial court erred in characterizing 32612 as quasi-community property subject to a 15 percent separate lien. It was Washburn's separate property because she owned it prior to the relationship with Davis. It is undisputed that she and her late husband purchased the property, and it remained her separate property.

The trial court found that "all of the parties' actions at all relevant times were consistent with treating the property as if it were a jointly owned asset," but

---

[8] In re Estate of Borghi, 167 Wn.2d 480, 484-85, 219 P.3d 932 (2009); Beam, 18 Wn. App. at 453.

[9] In re Marriage of Griswold, 112 Wn. App. 333, 339, 48 P.3d 1018 (2002).

[10] Soltero v. Wimer, 159 Wn.2d 428, 433, 150 P.3d 552 (2007).

[11] In re Marriage of Burrill, 113 Wn. App. 863, 868, 56 P.3d 993 (2002).

[12] Soltero, 159 Wn.2d at 433; see In re Sutton and Widner, 85 Wn. App. 487, 491, 933 P.2d 1069 (1997).

5

that is not enough to treat the property as jointly owned.[13] There was no evidence showing that Washburn intended to change the character of 32612 to quasi-community property, and the trial court made no such finding as to Washburn's intent

Nevertheless, the trial court alternatively characterized this property as "separate property subject to an 85 [percent] community lien" and only awarded 85 percent of the value of 32612 to the quasi-community.[14] Accordingly, the other characterization was harmless error.[15]

When separate property is brought into a CIR and quasi-community funds are used to make payments on the underlying obligation or to improve the separate property, the quasi-community has a right of reimbursement or an equitable lien.[16]

Here, the trial court's finding of an 85 percent quasi-community lien on 32612 was supported by testimony and documentary evidence of quasi-community labor and money devoted to making significant improvements to 32612 while the parties were living together. They installed a new deck, new laundry room, new roof and gutters, cedar siding, custom garage doors, new windows, new fireplaces, a retaining wall, and river rock walkway. Davis devoted

---

[13] Clerk's Papers at 52.

[14] Id.

[15] See Wallace Real Estate Inv., Inc. v. Groves, 72 Wn. App. 759, 771, 868 P.2d 149, aff'd, 124 Wn.2d 881 (1994).

[16] Connell, 127 Wn.2d at 351.

thousands of hours of physical labor, spending weekends and paid vacation time working on 32612.

Moreover, quasi-community funds were used to pay the obligation secured by the mortgage and the property taxes, and to finance the repairs and remodeling. Using receipts, Davis calculated he spent $128,000 from the shared account on remodeling since 2005. He did not have receipts for pre-2005 expenditures, but estimated that he spent a total of $223,461 beyond the costs of the mortgage and property tax.

Washburn argues that the trial court erred in imposing the quasi-community lien. She notes that, in addition to working on 32612, Davis spent a lot of time mountain climbing, and that his various climbing trips were very expensive. She also claims that some of Davis' work was substandard and argues that necessary work remains unfinished. These arguments essentially disagree with the court's view of the evidence. We reject them in light of the substantial evidence that supports the trial court's findings and its award of a quasi-community lien.[17]

Washburn also argues that the trial court's determination of the 85 percent quasi-community ratio and the dollar value increase due to quasi-community efforts are not supported by evidence in the record. She claims that Davis failed to submit any evidence that quasi-community expenditures or labor actually increased the value of 32612.

---

[17] See In re Marriage of Short, 125 Wn.2d 865, 874, 890 P.2d 12 (1995); In re Marriage of Rich, 80 Wn. App. 252, 259, 907 P.2d 1234 (1996).

This court affirmed the trial court's determinations of an increase in value and percent of a quasi-community lien based on similar evidence in In re Marriage of Lindemann.[18] David Lindemann had an auto body repair business when he began living with Kim.[19] They lived together for 10 years, and Kim sought an equitable share of the value added to the repair shop during the relationship.[20] The trial court had found that the shop's value at the beginning of the relationship was "no more than $10,000" based upon evidence that David could not afford tools, he owed back taxes, and he relied on his parents' home as security for an $11,000 loan.[21] It concluded that the net increase by the time of separation was $218,725, which was supported by a business evaluation.[22] On appeal, David objected to this valuation, but this court disagreed in light of his failure to present "authority or argument to show why the court's . . . evaluation was unjustified."[23]

Here, evidence showed that Washburn had purchased 32612 for $152,000, obtained loans and a bank mortgage totaling approximately $136,000 to finance the purchase, and made mortgage payments for three years. 32612 was appraised at $480,000 at the time of trial.

---

[18] 92 Wn. App. 64, 68-74, 960 P.2d 966 (1998).

[19] Id. at 68.

[20] Id. at 68-69.

[21] Id. at 71.

[22] Id.

[23] Id.

While it is not clear from the record exactly how the trial court arrived at the percentage of a quasi-community lien in this case, as in Lindemann, Washburn has failed to show why the trial court's evaluation was unjustified. Based on the evidence presented, the court could reasonably find that 85 percent of the $300,000 increase in value was due to the significant improvements made by the parties with quasi-community funds and labor.

Washburn cites to In re Marriage of Elam, as support for her contention that Davis failed to establish the dollar amount of the increase in value.[24] In that case, the trial court used a mathematical formula to determine what percentage of the increase in price was due to inflation and what percentage was due to improvements funded in part by the community.[25] But Washburn has failed to show that any such formula is mandated, especially in light of the significant amount of quasi-community funds and efforts in this case.

Finally, Washburn contends that, at a minimum, the increase in land value was her separate property. But she cites to no case law where the value of the underlying land was bifurcated from the value of the property as a whole. We reject this unsupported argument.[26]

---

[24] 97 Wn.2d 811, 650 P.2d 213 (1982).

[25] Id. at 817.

[26] See King Aircraft Sales, Inc. v. Lane, 68 Wn. App. 706, 717, 846 P.2d 550 (1993).

## OFFSET AND BENEFITS

Washburn argues that the quasi-community's right to reimbursement for its expenditures and efforts should be offset by the benefits received in living in 32612 for 17 years, rent-free. We disagree.

The court is not *required* to offset any quasi-community contribution with quasi-community benefits in determining whether a lien should be established. Instead, the trial court *may* offset with benefits received.[27] We review the trial court's decision to deny an offset for abuse of discretion.[28]

In In re Marriage of Miracle, the trial court determined that offset was proper because the community efforts were significantly less than the benefits received by the community.[29] In that case, community funds were used to make monthly payments of $124 to $151 on the family residence, which was the wife's separate property.[30] The parties were married for seven years and during that time, the husband provided no personal services and the parties made no improvements to the home.[31] The trial court determined that a reasonable rental value during that time would have been $250 to $300 per month.[32] Given that the rental value exceeded the community payments made, the trial court denied

---

[27] In re Marriage of Miracle, 101 Wn.2d 137, 139, 675 P.2d 1229 (1984).

[28] Id.

[29] 101 Wn.2d 137, 138-39, 675 P.2d 1229 (1984).

[30] Id. at 138.

[31] Id.

[32] Id.

the husband's request to award a community lien for the cost of the payments made.[33] The supreme court agreed in light of the trial court's finding that "the community had been adequately compensated for its expenditures by its beneficial use of the premises."[34]

Here, the facts are quite different. The testimony established the fair rental value of 32612 to be between $2,000 and $3,000 per month. But the quasi-community funds expended on 32612 far exceeded the rental value. Washburn claims that there was no basis for a quasi-community lien because Davis spent a substantial amount of quasi-community funds on his separate hobbies and purchases. We disagree because any such expenses and purchases were quasi-community expenses and quasi-community property, presumably incurred with the community's agreement.[35]

Given the evidence showing that the parties used quasi-community funds to pay off the loan secured by the mortgage and made "extreme" contributions by investing labor and funds to improve 32612, the trial court did not abuse its discretion by refusing to offset the quasi-community lien by benefits received.

## PARTITION AND ALLOCATION OF LOT 12

Washburn contends that the trial court erred in awarding a portion of Lot 12, which she claims is her separate property, to Davis based on his post-trial actions. She also claims that the trial court's award of that portion improperly

---

[33] Id.

[34] Id. at 139.

[35] Connell, 127 Wn.2d at 351.

11

increased the value of Davis' share because the trial court did not take this ownership into account when valuing and then apportioning the parties' assets. We disagree with both arguments.

Only Washburn's name was on the title to Lot 12 prior to this CIR. But she sold a portion of that property to the owners of 32607 in 2003, and signed a quit-claim deed. Because the portion of Lot 12 conveyed by Washburn was repurchased by these parties in 2010 when they purchased 32607, it was purchased with quasi-community funds. Thus, it is quasi-community property. In short, this lot is no longer her separate property.

Moreover, the trial court's award to Davis of a portion of Lot 12 did not improperly increase the value of his share of the quasi-community assets. Lot 12 has no value except as a means of access to the three SE 108th street properties. When the trial court initially awarded 32607 to Davis, it assumed that he would be able to obtain access to his property, ostensibly by an easement across Lot 12. The value of 32607 is the same whether Davis owns a portion of Lot 12 or just an easement across it.

Finally, Washburn claims that the trial court abused its discretion in considering evidence from a real estate attorney relating to ownership of Lot 12. She claims that she was denied the opportunity for legal argument or discovery. Washburn is incorrect.

On February 24, 2016, the trial court entered an order inviting her to file any response to the post-trial evidence on Lot 12 and to provide any supporting documentation. She responded and restated her arguments in her motion to

12

reconsider and motion for relief from judgment. In sum, this argument is unpersuasive.

## RESTRICTED STOCK UNITS

Washburn claims that the trial court erred by failing to distribute all of the RSUs as quasi-community property because under Connell, all such property "acquired" during the relationship is quasi-community property. We hold that the court correctly distributed this property.

In June 2013, Davis was awarded 15,078 RSUs when T-Mobile went public and granted RSUs to all its employees. The RSUs would vest over a period of three years with the first group vesting on February 25, 2015, the next third on February 25, 2016, and the final third on February 25, 2017. In order to receive the RSUs, the employee had to still be employed by the company on the day that group vested.

T-Mobile granted the RSUs four months before the parties separated, but they did not start to vest until 20 months later. Because the RSUs would only vest if Davis was employed with T-Mobile on the vesting date, and that date was after the relationship ended, the trial court had to determine what portion of the RSUs could be attributed to quasi-community efforts. In other words, what portion was earned before the parties separated. In making that determination, the trial court applied the time rule analysis set forth in In re Marriage of Short.[36]

At trial, Davis' accounting expert, Steven Kessler testified that 13.28 percent of the first group of RSUs, 667 shares, were quasi-community property,

---

[36] 125 Wn.2d 865, 890 P.2d 12 (1995).

and the court adopted that determination. Kessler arrived at this figure using the formula set forth in Short: the time of grant to time of separation as the numerator and the time of grant to time of vesting as the denominator.[37]

Washburn claims that Short is not applicable because that case concerns stock options, not RSUs. She argues that a stock option requires an employee to pay money to obtain the stock in the future while a restricted stock unit allows the employee to receive the stock in the future without making a payment. This distinction is irrelevant when applying the time rule.

Although an employee has to purchase the stock to take advantage of a stock option, the purchase or "strike" price is often at a significant discount, rendering the benefit very similar to an RSU. For example, in Short, the employee's stock option gave him the right to purchase Microsoft shares at $23 per share.[38] He purchased 7,000 shares at that price, sold some of those shares the same day at $64.75/share and the remainder five days later for $71.50/share, and made a before tax profit of around $500,000.[39] An RSU can be considered as a stock option with a $0 strike price.

Significantly, Kessler testified that RSUs and options are often treated the same for purposes of bookkeeping. We see no reason to depart from this approach in this case.

---

[37] Id. at 872, 875.

[38] Id. at 868-69.

[39] Id. at 869.

14

In sum, the <u>Short</u> analysis and formula applies to RSUs as well as stock options. Both provide a future benefit contingent on continued employment.[40] The trial court properly applied the time formula set forth in <u>Short</u> to the first group of RSUs to vest.

## JUST AND EQUITABLE DISTRIBUTION

Washburn claims that the trial court's decision to award her 51 percent of the quasi-community assets was inequitable "given the wide disparity in their earnings and [her] permanent disability."[41] We hold that the distribution was just and equitable, as the law requires.

In claiming that the trial court erred because it did not consider that, due to her health problems, her future financial needs would be greater than Davis', Washburn only cites to cases concerning the dissolution of a marriage.[42] At the dissolution of a CIR, the trial court may only distribute the quasi-community assets regardless of the post-separation economic circumstances.[43] Citation to dissolution cases is not persuasive because of the differences between the circumstances.

Here, the trial court noted that Washburn is 13 years older than Davis, in poor health, and earning substantially less. It also noted that Washburn's income

---

[40] See <u>In re Marriage of Langham & Kolde</u>, 153 Wn.2d 553, 564, 106 P.3d 212 (2005).

[41] Appellant's Opening Brief at 2.

[42] See, e.g., <u>In re Marriage of Davison</u>, 112 Wn. App. 251, 258-59, 48 P.3d 358 (2002).

[43] Cf. <u>Soltero</u>, 159 Wn.2d at 431-35.

was unlikely to change while Davis' is more volatile. Washburn was awarded her mortgage free home, 32611, which is currently rented for more than the debt secured by the mortgage, a $100,000 cash transfer from Davis, and approximately half of the couples' remaining joint assets.

In the case of a non-marital dissolution, the division of the property must be equitable but not equal. As long as there is a rational basis for the trial court's decision, it will not be overturned.[44] We conclude that the trial court did not abuse its discretion in distributing the parties' assets because there is a rational basis for the trial court's decision. The division was just and equitable.

## ATTORNEY FEES

Finally, Washburn has requested an award of attorney fees. Because Washburn has failed to cite to any law entitling her to an award of fees on appeal and we are unaware of any such law, we reject this request.

She sought fees below based on Davis' alleged discovery abuse and intransigence pursuant to CR 11. A trial court's decision on discovery sanctions is reviewed for abuse of discretion.[45]

The trial court considered Washburn's CR 11 claim and denied her request because there was no misconduct warranting such an award. On

---

[44] In re Sutton, 85 Wn. App. at 491-92.

[45] Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 338-39, 858 P.2d 1054 (1993).

16

appeal, Washburn has failed to demonstrate that the trial court abused its discretion in denying her request below for attorney fees as a sanction.[46]

Davis has also requested attorney fees based on the prolonged procedural history of this case. We deny his request because there is no showing of harm due to such delay.[47]

The orders on appeal are affirmed, and we deny the requests for attorney fees.

_____
Cox, J.

WE CONCUR:

_____          _____

---

[46] Id. at 339.

[47] RAP 18.9(a).